**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL H. SMITH, Ph.D.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | **No.** |
| **v.** | : | |
| | : | |
| **MODERNATX, INC.,** | : | |
| **Defendant.** | : | **JURY TRIAL DEMANDED** |

**<u>C O M P L A I N T</u>**

1. For more than a decade, Dr. Michael Smith was employed as a scientist, patent inventor, and team leader for ModernaTX, Inc. ("Moderna").

2. He played many roles in those capacities. For one, he and his team significantly contributed to the development and manufacture of Moderna's COVID-19 vaccine -- an event that catapulted Moderna from a small pre-clinical technology firm into a global pharma company. For his role in that, Moderna touted Dr. Smith to the media as a sign of its success.

3. Dr. Smith also contributed in many other ways to Moderna's growth. That included his development of non-COVID-19 therapeutic products that are currently being marketed by Moderna. He also created patents for Moderna and was designated as a subject matter expert to work with its internal and external lawyers on patent issues and litigation.

4. Dr. Smith received stellar performance reviews, pay raises, bonuses, stock grants and awards from Moderna for his achievements. He also received praise from

Moderna's top executives, including his direct report, Dr. Donald Parsons, who described his work as "world class."

5. Dr. Parsons also described Dr. Smith as follows: "He was a role model for the company's values . . . a role model for scientific innovation . . . [and] an excellent supervisor and manager." *See* Exhibit A attached hereto.

6. All Dr. Smith's hard work -- days, nights, and weekends -- took a significant toll on his health. His dedication to Moderna left hardly any time for anything else, including time with his wife and three young children. In early 2025, his declining physical and mental health reached a crisis point during which he suffered a breakdown at work. His treating physician diagnosed him with Major Depressive Disorder and advised him to take time off for treatment. As a result, Dr. Smith was approved leave for 3 ½ months under the Family Medical Leave Act ("FMLA") and short term disability.

7. Dr. Smith returned to work re-energized in early September 2025. From then to the end of the year, his performance was rated as "strong" by his new supervisor, Jason Fernandez. Nonetheless, for the year as a whole, Mr. Fernandez rated his performance as "inconsistent." He did so despite his awareness that for the better part of the year Dr. Smith had suffered from a major mental health crisis that led to approved FMLA leave to treat his condition.

8. Those facts were also known to Moderna's upper management and its Human Resources Department. Notwithstanding their knowledge, no one in authority did anything to rescind that "inconsistent" rating. In fact, as events swiftly unfolded in

early 2026, Moderna relied on that "inconsistent" rating to fire Dr. Smith and effectively end his pharmaceutical career.

9. How that transpired is a pinpoint of the discriminatory treatment to which Moderna subjected Dr. Smith because of his Major Depressive Disorder and the medical leave he took to treat it. Consider the following events.

10. In the beginning of 2026, Dr. Smith was approved for a transfer from his prior position as Director of Product Development to a similar position in Moderna's A.I. Department. Having served in that position for about a month, on the morning of March 12, 2026, he was informed that because his performance had been rated as "inconsistent" for calendar year 2025, his transfer to Moderna's Digital A.I. team had been rescinded.

11. In response, to save his job, Dr. Smith sought to be transferred back to his former department. Moderna denied that transfer. Its HR Department told him his request was rejected because his prior position no longer existed in light of his transfer to the Digital A.I. Department.

12. Caught between Scylla and Charybdis, Dr. Smith was fired on March 12, 2026 and told his termination would be effective as of March 27, 2026. Moderna did not wait until then to make its decision known. That very day, March 12, 2026, Moderna quickly locked Dr. Smith out of access to his computer, barred him from its facilities, and gave him no chance to speak with his work colleagues.

13. In response to these events, after exhausting his administrative remedies, Dr. Smith today has filed this lawsuit against Moderna for its violation of his rights under

the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. (the "ADA"), and the FMLA, 29 U.S.C. § 2601 *et seq*..[1]

## JURISDICTION

14. Subject matter jurisdiction over Dr. Smith's ADA claim is conferred pursuant to 28 U.S.C. § 1331, and it is conferred over his FMLA claim by 29 U.S.C. § 2617(a)(2).

15. The Court has personal jurisdiction over the parties since many of the relevant events in this case arose in this judicial district, Dr. Smith resides here, and Moderna regularly conducts business here.

## VENUE

16. Venue over Dr. Smith's claims is properly laid in this Court since he resides here, Moderna regularly conducts business here, and many of the relevant events in the case occurred here as well.

## PARTIES

17. Dr. Smith is a resident and citizen of the Commonwealth of Pennsylvania. He resides in Montgomery County, Pennsylvania

---

[1] Shortly, Dr. Smith will amend his Complaint to assert a parallel discrimination claim against Moderna under the Pennsylvania Human Relations Act, 42 Pa.C.S.A. § 951 *et seq*.

18. Moderna is a global pharmaceutical and biotechnology company with its principal place of business in Cambridge, Massachusetts.

## **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

19. On April 22, 2026, Dr. Smith filed a Charge of Discrimination against Moderna with the United States Equal Employment Opportunity Commission ("EEOC") in which he averred that the company terminated his employment in violation of his rights under the ADA. The Charge was docketed at No. 523-2026-02685 and was dual-filed with the Pennsylvania Human Relations Commission at No. 202507071. *See*, n.1, *supra*.

20. On September 1, 2026, the EEOC issued a Notice of Right to Sue letter to Dr. Smith authorizing him to file suit against Moderna on his ADA claim.

21. This lawsuit has been timely filed within the suit-filing provisions of the EEOC's 90-day letter.

22. There is no administrative exhaustion requirement regarding Dr. Smith's FMLA claim. That claim has been timely filed in this Court pursuant to the two year limitations period of the FMLA, 29 U.S.C. § 2617(c)(1).

## **ADDITIONAL FACTUAL AVERMENTS**

23. Dr. Smith received a Bachelor of Arts degree in Chemistry in 2007 from Wheaton College. In 2012 he received his Ph.D. degree in Analytical Chemistry from the Georgia Institute of Technology.

24. Between 2012 and 2014 Dr. Smith was employed as a Senior Scientist at Merck's Research Laboratories in West Point, Pennsylvania. There, he was rated as a top performer and received Awards of Excellence for his work and service to the company.

25. Recruited by Moderna, Dr. Smith began his employment there in April 2014 as a Scientist.

26. Based on Dr. Smith's performance and achievements, he was promoted four times after that.

27. First, he was promoted to the position of Senior Scientist, a position he held from 2016 to 2018.

28. Second, he was promoted to the position of Principal Scientist, a position he held from 2018 to 2019.

29. Third, he was promoted to the position of Associate Director, a position he held from 2019 to 2021.

30. Fourth, he was promoted to the position of Director, one he held from 2021 to 2026.

31. Over the course of his twelve years working at Moderna, Dr. Smith received stellar performance ratings.

32. Those included several 5 out of 5 ratings -- ones given to employees who had "career years" at the company.

33. The rest were mostly 4 out of 5 ratings -- ones given to employees who exceeded the company's expectations.

34. At no time prior to the events at issue here did Dr. Smith ever receive a poor performance review.

35. In addition to his duties as a scientist, Dr. Smith also was a team leader, a patent creator, and a subject matter expert who worked with Moderna's lawyers on patent issues and patent litigation.

36. He also was the author or co-author of peer-reviewed publications on an array of scientific, chemical, and other issues.

37. As a result of his stellar performance and significant contributions, Moderna annually increased Dr. Smith's salary, awarded him yearly bonuses, and provided him with a substantial amount of company stock and stock options.

38. In addition, Moderna recognized Dr. Smith as a top-10 performer and twice recognized him with special awards for having exemplified the company's values in the performance of his duties.

39. For most of his employment at Moderna, *i.e.*, between 2016 to 2024, Dr. Smith reported to Dr. Donald Parsons, Moderna's Head of Global Research and Development for its lipid nanoparticle therapies platform.

40. As described by Dr. Parsons, Dr. Smith exemplified all of Moderna's expressed values and expectations. Dr. Parsons said the following about Dr. Smith:

> Dr. Smith was recognized throughout the company as an innovative and creative scientific leader. His expertise in lipid nanoparticle formulation and process development was worldclass, and led to multiple innovations which provided significant value to the company, including developments which directly impacted the success of the Moderna's

> COVID-19 vaccine. He and his group developed novel formulations which improved the stability of the vaccine and were critical to the successful scale-up of the manufacturing process, which were both critical to the ability of the company to contribute meaningfully to pandemic response. These innovations also led to [a] number of global patent applications. Due to his technical innovations Dr. Smith frequently consulted with senior executives at the company on critical scientific decisions, and was highly recognized with several top-tier performance reviews.
>
> In addition to the fact that Dr. Smith had world-class expertise in a scientific area which was critical to Moderna's success, he contributed to the company in numerous other ways. He was widely recognized as a highly effective manager, developing next-generation talent for the company and organizing and leading his work team effectively. He was a role model for the company's values, and received corporate-level special recognition in this regard. He was also a role model for scientific innovation throughout the R&D organization, continually generating creative and impactful ideas to push the company's objectives forward.

*See* Exh. A.

41. Dr. Parsons was not the only executive who touted Dr. Smith's skills and performance.

42. Moderna's CEO, Stéphane Bancel, referred to him as Moderna's "MacGyver" -- so named for the television star and his problem-solving skills to save lives.

43. Because of Dr. Smith's forefront role in helping Moderna develop and bring to market its COVID-19 vaccine, Moderna touted him to the media.

44. That included an article in 2020 in *New York Magazine* in which he was pictured and described the challenges he and Moderna faced and overcame. *See* Exhibit B to the Complaint.

45. It also included a video newscast in which he was featured as a Moderna scientist: https://www.cnn.com/2020/12/13/us/cnn-heroes-most-inspiring-moment-2020.

**Dr. Smith Has A Mental Health Crisis**

46. Working around the clock to help solve the global COVID-19 health crisis took a significant toll on Dr. Smith's physical and mental health.

47. To perform his duties for Moderna meant taking time away from his wife and their three young children.

48. In very real terms, it meant becoming an absentee husband and father during critical years in their lives.

49. During the pandemic years particularly, Dr. Smith spent his time, including weekends and holidays, on his work for Moderna -- time he spent as an inventor and scientist, time as a team leader and mentor, time on the scale-up and manufacture of Moderna's vaccines, time he spent on regulatory filings, and time in meetings with Moderna's lawyers to help resolve company patent and other legal problems.

50. So limited were his days that Dr. Smith was not able to take parental leave when his daughter was born in late 2019.

51. Compounding all this, other events at work took a further toll on Dr. Smith's health.

52. In August 2024, Dr. Parsons retired.

53. Dr. Parsons was briefly replaced by Magalie Hickey but she was terminated after a brief tenure at Moderna.

54. In early 2025, Jason Fernandez became Dr. Smith's direct report.

55. Also, in early 2025, Moderna engaged in a reorganization that resulted in the dissolution of Dr. Smith's Product Development team -- several of whom were let go, others were reassigned, and only a few left for him to manage.

56. The cumulative effect of these years of non-stop work and the sudden reorganization of his department led to a mental health crisis that Dr. Smith suffered in the first quarter of 2025.

57. Even before then, he regularly received psychiatric treatment for depression and anxiety for his work-related stress.

58. In March 2025, he suffered a manic depressive episode at work.

59. Colleagues saw what had happened and were concerned about his condition.

60. Dr. Smith himself informed his new manager, Jason Fernandez, and HR partners Pratima Tothempudi and Odeal Jacob-Cruz, about the deterioration of his mental health. They urged him to take a leave of absence to obtain treatment.

61. After consulting his wife and treating psychiatrist, who diagnosed him with Major Depressive Disorder, he agreed.

**<u>Dr. Smith Takes An Approved Leave of Absence</u>**

62. Dr. Smith's leave encompassed both FMLA and short-term disability.

63. It commenced on May 16, 2025 and continued until early September 2025.

64. During that time, Dr. Smith spent three months participating in an Intensive Outpatient Program.

65. He returned to work fully prepared to continue his career at Moderna.

**Dr. Smith's Performance Reviews in 2025**

66. After his return to Moderna in September 2025, Dr. Smith performed his job duties to Mr. Fernandez's satisfaction.

67. As a result, Mr. Fernandez praised him and told him he had a "strong" fourth quarter, *i.e.*, the only full quarter of 2025 which was not impacted by either his manic depressive episode at work or his approved leave.

68. Despite that praise, in early March 2026 Mr. Fernandez rated Dr. Smith's overall performance in 2025 as "inconsistent." That was the first negative review he had ever received.

69. Mr. Fernandez based that conclusion on two negative quarters, the first and second quarters of 2025.

70. During the first quarter, he had suffered a mental health breakdown at work. During the second quarter, he was out on approved FMLA leave.

71. Rating Dr. Smith's performance as "inconsistent" in 2025, during much of which he suffered from a known mental health crisis and was unable to work, was a violation by Moderna of the FMLA and the ADA.

**Dr. Smith's Transfer to Moderna's Digital Department**

72. Dr. Smith requested a transfer to Moderna's Digital Team in light of the mental health issues he experienced in 2025.

73. His request was approved by senior Moderna leaders in both its Technical Development Team and its Digital Team.

74. In particular, it was approved by Jason Fernandez, his prior manager, Nedim Altaras, Mr. Fernandez's manager, Wade Davis, the Head of the Digital Team, and Ed Miracco, the Senior Director of the Digital Team.

75. So approved, Dr. Smith spent approximately four weeks working in and for the Digital Team.

76. His work there included one-on-one meetings with team colleagues; active participation in Microsoft Teams meetings; the development of a "Freedom-to-Operate Analysis" tool for members of Moderna's Legal Department -- for which Dr. Smith was praised for his "remarkable" work on the project; and his participation in a digital team meeting at Moderna's headquarters in Cambridge, Massachusetts.

**Dr. Smith is Fired**

77. Once on board as a participating member of the Digital Team, Moderna then played a catch-as-catch-can game with Dr. Smith. Here is how those events unfolded.

78. On the morning of March 12, 2026, Bryna McCool, Moderna's HR Business Partner for its Digital A.I. Team, informed Dr. Smith by telephone that he was not eligible to transfer from the Technical Development Team to its Digital A.I. Team due to his "inconsistent" performance rating for 2025.

79. She ended the call by telling him that the HR representative for the Technical Development Ream would be in touch with him shortly.

80. About 30 minutes later, Pratima Tothempudi, the HR Business Partner for the Technical Development Team, and Jason Fernandez, Dr. Smith's former boss, held a Teams Meeting call with Dr. Smith. They told him that his position on that team had been eliminated due to his transfer to the Digital A.I. Team.

81. As a result, Ms. Tothempudi informed Dr. Smith that he was being terminated from employment effective March 27, 2026.

82. Dr. Smith protested that decision.

83. He told Ms. Tothempudi and Mr. Fernandez that the decision to terminate him was based on his medical diagnosis which led to protected leave rather than any performance issue.

84. Neither Ms. Tothempudi nor Mr. Fernandez were moved, nor did they or anyone in upper management at Moderna who were involved in the decision, do anything to rescind the decision to terminate Dr. Smith's employment.

85. Moderna did not wait to implement its decision to terminate Dr. Smith's employment.

86. Within minutes of informing him he was being fired. Moderna cut off Dr. Smith's access to his computer, prohibited him from entering its facilities, and gave him no chance to speak with his colleagues at work.

**<u>The Effect of Dr. Smith's Firing</u>**

87. Dr. Smith dedicated twelve years of his professional life to Moderna.

88. He was part of the workforce that helped build the company from a ninety-five person startup to a successful global pharmaceutical enterprise.

89. He invented innovative technologies that are foundational to the products that Moderna sells today.

90. He sacrificed time with his family at the cost of his mental health to help Moderna grow and prosper.

91. He received high praise and performance reviews for his work and service, and was promoted four times by Moderna.

92. He suffered a documented mental health crisis that led to an approved FMLA and short-term disability leave -- only to be given a below-par "inconsistent" performance review and a negated transfer to Moderna's Digital A.I. Team that led to the loss of his job and effectively the end of his career in the pharma industry.

93. The impact of these events has been profound.

94. Cumulatively, they have been mentally wrenching, harmful to his reputation, and a strain on his family.

95. Together with the loss of his Moderna earnings and earnings capacity, they have transformed Dr. Smith from an upwardly mobile scientist and inventor into a diminished state hardly recognizable from the person who played a critical part in Moderna's success.

96. None of this would have happened but for Moderna's unlawful violation of Dr. Smith's rights under the ADA and the FMLA.

## CLAIMS FOR RELIEF

## COUNT I:

## MODERNA'S VIOLATION OF THE ADA

97. Dr. Smith repeats and incorporates by reference all the allegations set out in paragraphs 1 through 96 of the Complaint.

98. The ADA prohibits employers from discriminating against a "qualified individual" on the basis of disability. 42 U.S.C. § 12112(a); *see also id*. at 12111(8).

99. By virtue of his mental health crisis and Major Depressive Disorder diagnosis, and as evidenced by his FMLA and short-term disability leave, Dr. Smith was a "qualified individual" as defined by the ADA.

100. Moderna terminated Dr. Smith's employment in violation of his right to equal employment opportunity as guaranteed by the non-discrimination and non-retaliation provisions of the ADA. 42 U.S.C. § 12112(a) and 42 U.S.C. § 12203(a); *see also* 29 C.F.R. §825.220(c).

101. As a direct and proximate result of Moderna's violations of Dr. Smith's rights under the ADA, he has suffered and will continue to suffer a substantial loss of earnings and employee benefits to which he is entitled.

102. Those losses include, though are not limited to, Moderna's forfeiture of Dr. Smith's stock rights -- ones that would have dramatically increased since he was unlawfully fired by Moderna in March 2026.

103. Illustrative of those losses was an event that occurred in mid-August 2026.

104. On August 19, 2026, Moderna and Merck announced that, together, they had developed a melanoma cancer therapy that represented a "paradigm shift" in the treatment of that disease.

105. Moderna's stock tripled as a result of that announcement and has gone up since then.

106. Dr. Smith had contributed to the development of that therapy during the course of his employment at Moderna.

107. The loss to Dr. Smith of the stock he had earned at Moderna, but forfeited as a result of its decision to fire him, alone has cost him millions of dollars.

108. Moreover, had he not been unlawfully fired by Moderna, the additional stock he would have earned has incrementally cost him millions of additional dollars in losses.

109. In addition, as a further and direct result of Moderna's violation of the ADA, Dr. Smith has suffered and will continue to suffer physical pain and suffering, humiliation, embarrassment, harm to his reputation and loss of enjoyment of life's pleasures.

110. Moderna's decision to fire Dr. Smith was taken in willful, intentional and reckless violation of his rights under the ADA, a violation for which punitive damages are warranted.

**COUNT II:**

**MODERNA'S VIOLATION OF THE FMLA**

111. Dr. Smith repeats and incorporates by reference all the allegations set out in paragraphs 1 through 110 of the Complaint.

112. Apart from and in addition to violating Dr. Smith's rights under the ADA, Moderna also violated his rights under the FMLA.

113. Moderna was aware that Dr. Smith was out of work on an approved FMLA leave in order to care for and receive treatment for his mental health crisis.

114. Despite that knowledge, Moderna penalized and retaliated against Dr. Smith in reprisal for his taking needed leave during his mental health crisis by terminating his employment and imposing on him an unthinkable amount of additional pain and suffering.

115. Those actions were undertaken in knowing violation of Dr. Smith's right to be free of discrimination and retaliation for the exercise of his rights under the FMLA.

116. That violation consists of the following antagonism after Dr. Smith returned to Moderna from his approved FMLA leave:

- Its decision in early March 2026 to issue him an "inconsistent" performance evaluation for 2025 -- a year in which it knew and acknowledged that he suffered a severe mental health crisis that required months of FMLA and short-term disability leave.

- On the heels of that first ever poor performance review, and based entirely on it, its decision on March 12, 2026 to rescind Dr. Smith's approved transfer to its Digital A.I. Team.
- Just minutes later on March 12, 2026, its decision to deny Dr. Smith's request to be transferred back to his prior position with the Product Development Team.
- Its simultaneous decision to terminate Dr. Smith's employment that same day despite his protest that it was not based on his performance but, rather, was based on his health and his medical leave of absence.

117. As a direct and proximate results of Moderna's violation of Dr. Smith's rights under FMLA, Dr. Smith has suffered and will continue to suffer a loss of earnings and employee benefits to which he is entitled. *See* ¶¶ 101-108, *supra*.

118. Moderna terminated Dr. Smith's employment in willful, intentional and reckless violation of his rights under the FMLA, thus entitling him to an award of liquidated damages.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Dr. Smith respectfully requests the Court to enter judgment in his favor and against Defendant Moderna and to include in it the following relief:

a. An award of back pay;

b. An award of front pay;

c. An award of compensatory damages under the ADA;

d. An award of liquidated damages under the FMLA;

e. An award of punitive damages under the ADA;

f. An award of reasonable counsel fees and costs; and

g. Such other legal and equitable relief as may be just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff Michael Smith demands a jury trial on all the legal claims set forth in his Complaint.

**RAYNES & LAWN**

By: [signature]

Harold I. Goodman, Esquire
Noah J. Goodman, Esquire
2400 Market Street
Suite 317
Philadelphia, PA 19103
215-568-6190

Attorneys for Plaintiff Michael H. Smith, Ph.D.

Dated: October 27, 2026

# Exhibit A

Exhibit A

Donald Parsons, Ph.D.
33 3rd Ave. Apt. 1A
Charlestown, MA 02129

March 19, 2026

To whom it may concern,

I am writing to provide a letter of recommendation for Dr. Mike Smith. I have over thirty years of experience in the pharmaceutical and biotechnology industry, including twenty-five years of experience as a manager, supervisor and R&D executive. I led global research and development activities for Moderna's lipid nanoparticle platform during my eight years with the company, and was Dr. Smith's supervisor throughout that time. In my experience, he was an outstanding employee, providing very significant value to the company through his scientific innovation, his leadership as a manager, and his dedication to Moderna's success.

Dr. Smith was recognized throughout the company as an innovative and creative scientific leader. His expertise in lipid nanoparticle formulation and process development was world-class, and led to multiple innovations which provided significant value to the company, including developments which directly impacted the success of the Moderna's COVID-19 vaccine. He and his group developed novel formulations which improved the stability of the vaccine and were critical to the successful scale-up of the manufacturing process, which were both critical to the ability of the company to contribute meaningfully to pandemic response. These innovations also led to an number of global patent applications. Due to his technical innovations Dr. Smith frequently consulted with senior executives at the company on critical scientific decisions, and was highly recognized with several top-tier performance reviews.

In addition to the fact that Dr. Smith had world-class expertise in a scientific area which was critical to Moderna's success, he contributed to the company in numerous other ways. He was widely recognized as a highly effective manager, developing next-generation talent for the company and organizing and leading his work team effectively. He was a role model for the company's values, and received corporate-level special recognition in this regard. He was also a role model for scientific innovation throughout the R&D organization, continually generating creative and impactful ideas to push the company's objectives forward.

Overall, Dr. Smith is a scientific and technical leader with long track record of world-class innovation in business-critical areas that generated significant corporate value. He is also an excellent supervisor and manager; and a role model for his peers. I recommend him without reservation.

Sincerely yours,

Donald Parsons, Ph.D.

# Exhibit B

Exhibit B

***The Intelligencer Feed***

**ENCOUNTER**

## **On the Front Lines of Moderna's Vaccine Program** The past year has been a blur for scientist Mike Smith

*By James D. Walsh, Intelligencer features writer*

Dec 8, 2020



Photo: Victor Llorente

"I've been like a ghost," says Mike Smith from Moderna's production facility in Norwood, MA, the building he's haunted for the past ten months. He's in a conference room, clean shaven and surprisingly energetic as he tries to describe just how extraordinary the year has been. As an associate director of production at Moderna, one of the companies currently seeking regulatory approval for a promising COVID-19 vaccine (Pfizer and its partner BioNTech and AstraZeneca and its partner Oxford University are the others), Smith oversees about 65 people, working in three shifts around the clock to manufacture Moderna's vaccine. Occasionally, he finds himself working 32 hours straight.

"My phone is pinging all hours of the day and night. I hear it in my dreams," Smith, 35 years old, says. He has three young children, including a one-year-old girl who was born around the time COVID-19 first emerged in China in 2019. Smith had planned to take paternity leave earlier this year, but that went out the window in January. "Just last night my wife said, 'I haven't seen you in a year,'" Smith adds.
Smith adds.

The biggest challenges were problems of engineering, scale, and speed. How do you increase batches of vaccine from milliliters to thousands of liters and transport them around the world without compromising their delicate chemistry? That challenge is why Smith, a self-described nano-particle geek who has spent his career focusing on units in the order of one-billionth of a meter, has spent much of the past year thinking on a much larger scale, figuring out how to produce enough vaccine for about one-seventh of the world's population by the end of 2021. The solution has required some flexibility. In recent months Smith has alternated between roles as a scientist, a process engineer,

and a production manager. For others at Moderna, the solution has required brute force. When Smith's colleagues couldn't fit a massive piece of equipment through a door at the company's headquarters one summer weekend, rather than wait until Monday to submit a work order to facilities, they found a sledgehammer and knocked down the wall themselves.

"There's a lot of worry about speed and development," Smith says, referring to the alarming number of Americans who say they won't take a COVID-19 vaccine when one is available. "That's when you rush, when there's something in the way you can literally knock down. What wasn't rushed, was this thing that I care so much about — the technology involved."

The technology, in this case, is both the hardware and chemistry that went into producing the formula Moderna employees call "mRNA-1273." For the better part of the last decade, Moderna and other biotech companies have been developing mRNA — short for "messenger RNA" — vaccines. (Pfizer's COVID-19 vaccine also uses mRNA.) Rather than injecting patients with the antigen protein itself, mRNA vaccines train cells to make their own protein, setting off the body's immune responses. Before the pandemic, Smith worked primarily on fine-tuning the mechanism, called the lipid nanoparticle or LNP, used to deliver mRNA to cells without damaging the payload. Moderna's technology was unique because its "platform," as Smith calls it, could swap out genetic sequences so that it could be used to vaccinate against all manner of ailments, like a miracle gadget you might buy on QVC.

The mRNA application that most excited Smith was its use to create personalized "therapeutic vaccines" for cancer patients. Using the genome sequences of both the patient and the cancer, Moderna could design a customized dose for one person that would stop the cancer from spreading. Smith worked to get the entire process down to a little over a month. The lessons Smith learned refining that process and increasing production speed would come in handy when Moderna enlisted its platform in the fight against COVID-19.

"It's like the stars were aligned and the science was ready. The scientific concepts and the physics were established, we had all of the pieces and components," says Smith. "If this had happened five years ago, I don't think we would have been ready to respond at the speed we did. This is a weird thought, but I feel like we — all of us — got really lucky."

By late January, scientists in China had sequenced the SARS-CoV-2 genome. Soon after that, Moderna scientists in Cambridge fed that code into mRNA which was shuttled to cells via the LNP and, sure enough, the cells began to produce the protein necessary to trigger the body's immune response. "It all just clicked. It was working just as designed," says Smith. It took only 42 days to develop the vaccine. (The previous record was four years.) By late March, Moderna's mRNA-1273 was being administered to subjects in its first human trial, an experience Smith describes as surreal.

"You don't normally have so much press coverage of clinical trials," he says. "I was sharing a photo of a patient getting injected in her arm and I zoomed in on the syringe and my colleagues were huddled around staring at it saying, 'Oh, man it looks good.' It was heavy though, because you look over at the patient sitting there and she is a person receiving that product. It was emotional for me as a scientist."

Last month, the vaccine showed 94-percent efficacy in phase three trials, far surpassing even the most optimistic predictions being made in the fall. The good news didn't end there, Moderna's vaccine was 100 percent effective against severe disease — not a single trial participant who received mRNA-1273 was sent to the hospital. Moderna has had plenty of help along the way. The company took close to $1 billion in federal funding as part of Operation Warp Speed, all of which the company says went toward the clinical trials. On Monday, Moderna filed an application for an Emergency Use Authorization with the FDA, meaning the first doses of the vaccine could be injected in patients as soon as December 21. While Pfizer's vaccine is likely to be available a few days before Moderna's, one distinct advantage Moderna's mRNA-1273 has over Pfizer's mRNA vaccine is that it doesn't require ultra-cold storage conditions. (When I ask him to explain why, he says he needs to choose his words carefully in order to protect Moderna's intellectual property.) Moderna CEO Stéphane Bancel has said his company is ready to ship 20 million doses of the vaccine — enough for 10 million people, as it requires two shots administered a month apart — before the end of 2020, 100 to 125 million doses in the first quarter of next year, and a total of 500 million to a billion doses by the end of 2021. It's a previously unimaginable timeline that is possible in large part because the vaccine, even before it has been approved, is being produced by Smith's team at all hours of the day.

Since January, Moderna has hired hundreds of people and built the new, state-of-the-art manufacturing facility in Norwood. It contracted with Lonza, a manufacturer that had facilities in New Hampshire and Switzerland. Smith was tasked with figuring out how to scale up the production technology. Normally, Smith would produce batches of vaccine no larger than a small milk carton. Now, Smith's team needed to consistently produce batches that could fill a

hot tub, a difficult job given the delicate chemistry and physics at work and a treacherous one considering the margin for error. Very quickly, Smith ran into supply-chain bottlenecks. Would there be enough high-quality water? What about single-use sterile bags? And glass for vials? The manufacturers who produced these specialized raw materials hadn't anticipated suddenly getting an order for the largest-scale vaccine during a pandemic. Once he'd figured out how to scale up the technology, Smith switched to his current role overseeing the manufacturing team that set to work making batches of the vaccine, all day, every day.

Smith says Moderna is on track to hit the production goals Bancel has laid out. Still, he hasn't made vacation plans. Anytime he is away from the office, Smith says he is surrounded by reminders of why he needs to get back to work. "I want my kids to see their grandparents again. I have a one-year-old who hasn't really interacted with any family this whole time," he says, quick to add that he thinks he's one of the lucky ones. "It just feels like a crushing responsibility."